UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  1/2/2020_____

Y-GAR CAPITAL LLC,

               Plaintiff,

               -against-

CREDIT SUISSE GROUP AG, CREDIT SUISSE AG,
CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE
SECURITIES (USA) LLC, TIDJANE THIAM, DAVID
R. MATHERS, JANUS HENDERSON GROUP PLC,
JANUS INDEX & CALCULATION SERVICES LLC
and JANUS DISTRIBUTOR LLC,

               Defendants.

19 Civ. 2827 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    This is one of several cases arising out of the collapse of VelocityShares Daily Inverse

VIX Short Term Exchange Traded Notes, a complicated and risky investment instrument

designed to allow investors to profit off of low volatility in the stock market. *See, e.g.*, *Set*

*Capital LLC v. Credit Suisse Grp. AG*, No. 18 Civ. 2268, 2019 WL 3940641 (S.D.N.Y. Aug. 16,

2019*), report and recommendation adopted*, *Set Capital LLC v. Credit Suisse Grp. AG*, No. 18

Civ. 2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019), *appeal docketed*, No. 19-3466 (2d Cir.

Oct. 18, 2019); *Halbert v. Credit Suisse AG*, No. 2:18 Civ. 00615, 2019 WL 3975362 (N.D. Ala.

Aug. 22, 2019).[1]  Plaintiff, Y-GAR Capital LLC, which purchased a large quantity of those

instruments and consequently lost a great deal of money when their value crashed, claims that

this collapse was not an accident, but rather arose out of risks that the issuers, underwriters, and

marketers of the notes—Defendants here—knew of, concealed, and intentionally exacerbated as

---

[1] Plaintiff, Y-GAR Capital LLC, had contended to be the lead plaintiff in one of these earlier actions alleging
securities violations related to the collapse of XIV notes.  *See* Case No. 18 Civ. 2268, ECF No. 29.  Eventually,
however, Plaintiff opted out of the class that brought that action, and filed this individual opt-out suit.  *See* Case No.
19 Civ. 2827, ECF No. 36, at 1.

part of a scheme to reap large profits.  Compl. ¶¶ 1–17, ECF No. 1.[2]  Now before the Court are

Defendants' motions to dismiss Plaintiff's complaint for failure to state a claim under Federal

Rule of Civil Procedure 12(b)(6).  ECF Nos. 19, 22.  For the reasons stated below, those motions

are GRANTED.

## BACKGROUND

I.     Factual Background

VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes ("XIV notes" or

"XIV ETNs") provided a mechanism by which investors could profit from low volatility in the

stock market.  *See* Compl. ¶ 2.  In purchasing an exchange traded note ("ETN"), investors agree

to pay money to the institution sponsoring the ETN in return for a payment when the note

matures, the amount of which is determined by the value of a market index.  *Id.* ¶ 35.  The XIV

ETNs in this case derived their value from the S&P VIX Short-Term Futures Index, an index that

measures volatility in the stock market.  *Id.* ¶ 37.  To allow investors to bet against market

volatility, the value of XIV notes was inverse to the value of the VIX Futures Index.  *See id.* ¶

38.  Defendant Credit Suisse AG issued and sold the notes, and Defendant Janus Henderson

Distributors placed and marketed them.[3]  *Id.* ¶ 35.

Credit Suisse AG and Janus Henderson Distributors issued a prospectus for the XIV

notes, and a supplement to the prospectus on January 29, 2018 (the "Pricing Supplement" or the

"Supplement") in connection with the issuance of more than 16 million additional notes.  *Id.*

¶ 70; *see* Pricing Supplement, ECF No. 21-1.[4]  The Supplement set out the conditions under

---

[2] All citations to docket numbers refer to entries on the docket in this case, unless otherwise noted.
[3] Defendant Janus Distributors, LLC, does business as Janus Henderson Distributors, Compl. ¶ 31.
[4] The statements made in the Supplement are quoted extensively in the complaint, *see, e.g.*, Compl. ¶¶ 72, 74, 76, 78, 80, 82, 84, 85, and the details of those statements are essential to Plaintiff's claim.  Because it is "integral" to the events that Plaintiff has "identified as the basis for its [c]omplaint," it is deemed to be part of the complaint for purposes of this motion to dismiss.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

which Credit Suisse AG would be required to pay noteholders, and provided that the company would pay them based on the notes' "closing indicative value"—an amount calculated at the end of each trading day based on that day's movement in the VIX Futures Index. *See* Pricing Supplement at PS-7. Because the closing indicative value was only calculated once per day, an "intraday indicative value" was also automatically calculated and distributed every 15 seconds, by applying the same formula used to calculate the closing indicative value to the most recent value of the Index. *See id.* Neither the closing indicative value nor the intraday indicative value necessarily reflected the actual market price of the notes. *See id.* at PS-8. If the notes matured, Credit Suisse AG was required to pay the closing indicative value on the maturity date. *Id.* at PS-4. Credit Suisse AG could also "accelerate" the notes in two circumstances: (1) at its option, in which case it would be required to pay the closing indicative value at a date at least 5 days after the optional acceleration; or (2) if a predefined "Acceleration Event" occurred in which case it would pay the closing indicative value on the day the Event occurred. *See id.* at PS-6. One such Acceleration Event was the intraday indicative value of the notes dropping to less than 20% of the previous days closing indicative value. *Id.* at PS-46.

The Supplement designated Defendants Credit Suisse International and Janus Index & Calculation Services LLC—two entities affiliated with, but separate from, Credit Suisse AG and Janus Henderson Distributors—as responsible for calculating the value of the notes, and allocated responsibilities between them. *Id.* at PS-49. Janus Index & Calculation Services had "the sole ability to calculate and disseminate the Closing Indicative Value," while Credit Suisse International had "the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts." *Id.*

The Supplement also included detailed warnings about the risks associated with trading XIV notes. In broad terms, it warned that "[t]he long term expected value of [the] ETNs is zero. If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment." *Id.* at PS-16. It disclosed that Credit Suisse AG intended to hedge its exposure to the notes by buying VIX futures, and that "[t]he costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs." *Id.* at PS-13. And the Supplement specifically warned that investors faced a risk of losing their investment in the event of an acceleration: "[B]ecause of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the amount of your initial investment in the ETNs, and you are likely to lose all or part of your initial investment." *Id.* at PS-10.#

By January 2018, Credit Suisse AG had issued approximately 10.8 million XIV notes, and their indicative value as of January 26, 2018, was $134.14 per note. Comp. ¶ 41. On January 29, 2018, Credit Suisse issued another 16.3 million notes. *Id.* ¶ 56. The events that ultimately led to this litigation occurred on February 5, 2018, when the S&P 500 dropped roughly 4%. *Id.* ¶ 57. This drop caused volatility to spike, and the VIX Futures Index to spike with it. *Id.* ¶¶ 58–59. Over the course of regular trading on February 5, the price of XIV notes dropped to $99, from $115.55 the previous day. *Id.* ¶ 60. To hedge against risks that this drop in value created, Credit Suisse AG bought large numbers of VIX futures contracts. *Id.* ¶¶ 60–61. Credit Suisse AG and other market participants' efforts to buy up futures pushed trading volumes much higher than usual, which caused the VIX Futures Index to skyrocket, and thus the value of XIV notes to plummet. *Id.* ¶¶ 61–62. By 6:30 p.m., the price of XIV notes had dropped 90% from the previous day's closing price to approximately $10 per note. *Id.* ¶ 64. On February 6,

2018, Credit Suisse declared an Acceleration Event based on the drop in value, specifying February 15, 2018 as the date for calculating the closing indicative value that would be paid out to noteholders. *Id.* ¶ 67. Credit Suisse AG ultimately redeemed the notes at $5.99 per note. *Id.*

## II. Procedural Background

Plaintiff was a purchaser of XIV notes. Compl. ¶ 22. On March 29, 2019, Plaintiff filed suit against Credit Suisse AG (the issuer), Credit Suisse International (one of the calculation agents), Credit Suisse Securities (USA) (the underwriter), Credit Suisse Group AG (their holding company), Tidjane Thiam (Credit Suisse Group's CEO), David R. Mathers (Credit Suisse Group's CFO) (collectively, the "Credit Suisse Defendants"); and Janus Henderson Distributors, LLC (the marketer), Janus Index & Calculation Services LLC (the other calculation agent), and Janus Henderson Group plc (their holding company) (collectively, the "Janus Defendants"). *See id.* ¶¶ 23–34. Plaintiff claims that Defendants violated Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o, and Sections 9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78i, 78j(b), 78t(a). Compl. ¶ 18. On May 16, 2019, the Credit Suisse Defendants and the Janus Defendants each filed motions to dismiss the complaint for failure to state a claim. ECF Nos. 19, 22.

## DISCUSSION

## I. Legal Standards

### A. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a pleading "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations," but must assert "more than labels and

conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* On a Rule 12(b)(6) motion, the court may consider only the pleading, documents attached to the pleading, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the pleading as true and draw all reasonable inferences in favor of the non-movant. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

B. Rule 9(b) and the PSLRA

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." It is well settled that "the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b–5" of the Exchange Act. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). And "the heightened pleading standard of Rule 9(b) [also] applies to [Securities Act] Section 11 . . . claims insofar as the claims are premised on allegations of fraud." *Id.* at 171 (internal quotation marks and citation omitted). When Rule 9(b) applies, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 170. To satisfy the fourth element, Rule 9(b) requires plaintiffs to "state with particularity the specific facts in support of plaintiffs' belief that defendants' statements were false when made." *Id.* at 172 (internal quotation marks and citation omitted).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, also enhances the pleading requirements in securities suits. In any suit where a plaintiff "alleges that

the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Moreover, if plaintiffs' claims are ones where "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," then the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

II.    <u>Section 11 Claim</u>

To state a claim under Section 11 of the Securities Act, Plaintiff "must allege that: (1) [it] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (internal quotation marks and citation omitted).  Plaintiff's claim fails on the third prong.  The complaint fails to allege any misstatement or omission by Defendants actionable under Section 11.

Plaintiff alleges that the offering documents in this case contained a number of statements that were rendered misleading by the omission of key information.  Chiefly, Plaintiff points to

the Pricing Supplement's description of the investors for whom XIV notes might be a suitable investment, which included "sophisticated investor[s] seeking to manage daily trading risk using a short-term investment, and [who] are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable," "sophisticated investor[s] using the ETNs to manage daily trading risks and [who] understand that the ETNs are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives," and investors who "believe the level of the applicable underlying Index will . . . decline . . . by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs."  Compl. ¶ 74. Plaintiff asserts that these descriptions were misleading for two reasons:  (1) XIV notes carried an undisclosed risk of sudden, catastrophic loss of value due to low liquidity in the VIX futures market, a long period of low volatility, and the large effects of Credit Suisse's rebalancing; and (2) Credit Suisse had an undisclosed plan to use those factors to destroy the value of XIV notes. Pl. Mem. at 16; ECF No. 30.

A.  Rule 9(b) and the PSLRA Apply

The gravamen of Plaintiff's claim under Section 11 is that "Credit Suisse . . . designed the XIV [notes] to fail," Compl. ¶ 72, and then concealed that design from investors.  Plaintiff alleges that, at a minimum, Credit Suisse knew of and covered up the risk that XIV notes would collapse, and the heart of their claims is that Credit Suisse intended that result from the beginning.  That is a claim sounding in fraud, regardless of the "label used in the pleading."

*Rombach*, 355 F.3d at 172. Thus, for the Section 11 claim as well as the Section 10(b) claim, Rule 9(b) requires the complaint to "state with particularity the specific facts in support of plaintiff['s] belief that defendants' statements were false when made." *Id.* (internal quotation marks, citation, and brackets omitted). And because these claims require Plaintiff to establish that Defendants misstated or omitted material facts, they are also subject to the PSLRA's requirement that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

###### B. Alleged Undisclosed Risks

Plaintiff's claim that Credit Suisse failed to disclose the objective risks of investing in XIV notes cannot succeed, because the Pricing Supplement expressly disclosed that investors in XIV notes risked the sort of catastrophic losses that occurred here. There cannot be a material misstatement or omission if "[defendants'] statement[s] explicitly disclosed the very . . . risks about which [plaintiff] claim[s] to have been misled." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 135 (2d Cir. 2011) (internal quotation marks and citation omitted). The Pricing Supplement in this case explicitly disclosed that "[b]ecause of the large and sudden price movement associated with futures on the VIX Index . . . the ETNs are intended specifically for short term trading." Pricing Supplement at PS-14. The Pricing Supplement also repeatedly warned that "[i]f the applicable underlying Index declines or increases, as applicable, investors should be willing to lose up to 100% of their investment." Pricing Supplement at PS-10; *see also id.* at PS-14 ("[Y]ou may lose all or a significant part of your investment in the ETNs."). It specifically warned that this loss would likely materialize if Credit Suisse exercised its right to accelerate the

notes.  *See id.* at PS-10 ("[B]ecause of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the amount of your initial investment in the ETNs, and you are likely to lose part or all of your initial investment.").  The Pricing Supplement further warned that "the Inverse ETNs . . . are linked to the daily performance of the applicable underlying Index and include . . . inverse . . . exposure," so "changes in the market price of the underlying futures will have a greater likelihood of causing such ETNs to be worth zero."  *Id.* at PS-28.  And it warned that this risk had the potential to materialize within a single day:  "In particular, any significant increase in the market price of the underlying futures on any Index Business Day will result in a significant decrease in the Closing Indicative Value and Intraday Indicative Value of the Inverse ETNs."  *Id.*

Plaintiff also points to the Supplement's warnings regarding Credit Suisse's hedging; Plaintiff claims that the it warned only of the possibility that Credit Suisse's hedging might affect the value of the notes, and that Credit Suisse might have a conflict of interest for that reason, when in fact the adverse effects of hedging were a known certainty.  Compl. ¶¶ 82, 83.  But the Pricing Supplement's disclosures related to hedging were adequate to warn any reasonable investor that this risk existed.  It warned that Defendants "expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to . . . the VIX Index," and that "these hedging activities may adversely affect the level of the applicable underlying Index . . . and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date."  Pricing Supplement at PS-24.  More specifically, it warned, "It is possible that we,

our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero." *Id.* That is exactly what Plaintiff alleges occurred. Defendants were not required, as Plaintiff asserts they were, to go further, and state that the adverse effect of Credit Suisse's hedging on the value of XIV notes was inevitable. The disclosures in the Supplement "are of sufficient precision and clarity to alert prudent investors to the nature of the offerings and the risks entailed." *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008). Nothing more was required. *See Set Capital*, 2019 WL 4673433, at *6 (holding the same statement "reflected nothing more than Credit Suisse's permissible refusal to predict the future performance of the market"); *see also TVIX Sec. Litig.*, 25 F. Supp. 3d 344, 458 (S.D.N.Y. 2014) ("Once Credit Suisse warned investors that the TVIX ETNs' price would be affected by changes in supply and demand, and further explained in the press release that the suspension of new issuances could result in a premium of market price over Indicative Value, it was not obligated to make a predication as to the probability that this would occur."); *Panther Partners*, 538 F. Supp. 2d at 664 ("The securities laws do not require clairvoyance in the preparation of offering documents.").

Plaintiff argues that even if the Supplement disclosed the general risk that XIV notes could quickly lose value, it did not disclose the particular risks that caused the crash in this case. Pl. Mem. at 16–17. Plaintiff asserts that Defendants failed to disclose "the imminent threat of collapse due to the historically low volatility environment," "a short-volatility market imbalance," "a glut of inverse exchange-traded volatility products (including the XIV [notes]) subject to daily rebalancing," and "a pronounced lack of liquidity in VIX futures and other volatility markets." *Id.* at 16 (internal quotation marks and citations omitted); *see* Compl. ¶ 46.

Although it is true that the Pricing Supplement does not discuss these specific risk factors, it did warn of the result that Plaintiff claims they produced: investors' loss of nearly their entire investment as a result of a sudden jump in volatility combined with Credit Suisse's hedging. Under the "bespeaks caution" doctrine, alleged omissions are "immaterial as a matter of law" if cautionary language in the offering documents is clear enough to ensure the omissions would not "mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). The doctrine does not apply when "cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Id.* at 359. But here the Pricing Supplement's cautionary statements directly addressed the risks that ultimately materialized. As a result, the alleged omissions are immaterial as a matter of law.

Plaintiff's other assertions of misleading or false statements about objective risks fail for the same reasons. Plaintiff points to the range of "hypothetical examples" the prospectus laid out to demonstrate how the XIV notes would perform in different circumstances, which did not include any examples of sudden and catastrophic loss. Compl. ¶¶ 80–81. But the risk of sudden losses was clearly disclosed elsewhere. *See* Pricing Supplement at PS-10, PS-14. Similarly, Plaintiff claims that the Pricing Supplement's warnings that the XIV notes were likely to lose money over the long term and were unsuitable for investors who prefer lower-risk, lower-return investments were misleading because they downplayed the risk investors faced. Compl. ¶ 78. Again, that claim cannot be sustained in the face of the Supplement's express disclosures.

C. Alleged Undisclosed Scheme

Plaintiff claims that the XIV note offering documents were materially false or misleading for a more fundamental reason: Credit Suisse designed the notes to fail, with the intent of

triggering their failure at the next uptick in market volatility. Plaintiff argues that whatever disclosures Defendants made, therefore, were inadequate, because the offering documents gave no indication of this scheme. But the complaint does not "state with particularity the specific facts in support of plaintiff['s] belief that" such a plan existed. *Rombach*, 355 F.3d at 172.

Courts in this district have recognized that when a security's issuer fails to disclose a scheme to manipulate the value of the security, that failure is an actionable omission. *See, e.g.*, *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89–90 (S.D.N.Y. 2015) (holding plaintiffs had established material misrepresentations by plausibly alleging that "[d]efendants knew in advance that they would use the offerings to facilitate high-volume short selling on the part of their hedge fund clients, causing ECD and its shareholders to suffer tremendous losses"); *Dandong v. Pinnacle Performance Ltd.*, No. 10 CIV. 8086, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) (holding risk disclosures "indicating the possibility of decline cannot be used to shield [defendants] from [p]laintiffs' allegations that [defendants] had custom-built [the securities] to intensify the normal risk of principal loss" (internal quotation marks omitted)). But to make out such a claim, plaintiffs must plead with particularity facts that give rise to an inference that the issuer was pursuing such a scheme. It is not sufficient to "allege[] that defendants' conduct was manipulative because they did not tell [buyers] that their conduct was manipulative." *Brady v. Top Ships Inc.*, No. 17 Civ. 4987, 2019 WL 3553999, at *8 (E.D.N.Y. Aug. 5, 2019), *appeal filed*, No. 19-2693 (2d Cir. Aug. 27, 2019).

Instead, Plaintiff must put forward particularized factual allegations that show that Defendants intended to crash XIV notes.[5] And they have failed to do so. Although the

---

[5] It is not clear whether this claim is also one on "which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," in which case the PSLRA requires that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Ordinarily, the question of whether defendants have made a material

complaint frequently repeats the allegation that the XIV notes were "designed to self-destruct," Compl. ¶¶ 4, 46, 75, 81, it does not plead with particularity facts that illustrate this design. The section of the complaint labeled "Defendants Design the XIV to Fail" describes the risk of collapse XIV notes faced and the eventual mechanism that caused their value to crater, but alleges few if any facts that show that Credit Suisse planned to cause that result. It alleges that Credit Suisse sold an additional 16.3 million notes in January of 2018, when the risk of collapse was already substantial. *Id.* ¶ 56. And it asserts that this decision demonstrates a calculated plan, because Defendants as "the creators, portfolio managers, and distributors of the XIV" notes must have "possessed unique insider knowledge about the risks faced by the XIV [notes]," *id.* ¶ 55, and "Credit Suisse had unique visibility into the imminent threats [] posed to the XIV [notes] as a result of the glut of volatility ETPs." *Id.* ¶ 56; *see also id.* ¶ 60 (Credit Suisse was "armed with its insider knowledge of VIX futures markets and the unique ability to influence these markets as manager to some of the largest volatility-linked ETPs."). It also asserts that a plan can be inferred because Credit Suisse made a large profit from the collapse of XIV notes. *Id.* ¶ 68–69.

These allegations fall short of the level of specificity Rule 9(b) requires. Generally, particularized allegations of knowledge of market conditions will "identify specific reports or meetings, name the actors involved, or indicate the substance of the data or conversations" that gave rise to that knowledge. *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 54 (E.D.N.Y.

---

misrepresentation and the question of whether they acted with scienter are analytically separate; thus, a plaintiff can state a claim under Section 11 without establishing that defendants acted with a wrongful mental state. *See Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) ("[P]laintiffs alleging violations of Sections 11 and 12(a)(2) not need plead scienter, reliance, or loss causation." (internal quotation marks and citation omitted)). But when defendants' alleged misrepresentation is concealment *of their mental state*, proof of that mental state would presumably be required, and the action would, therefore, appear to be covered by the PSLRA's heightened pleading requirement for scienter. If the PSLRA's requirement of a "strong inference that the defendant acted with the required state of mind" applied here, it is difficult to see how Plaintiff's allegations could clear that hurdle. But because Plaintiff's claim fails to satisfy the requirements of Rule 9(b), Court need not determine whether that additional requirement applies, and so the Court expresses no opinion on that issue.

1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023 (2d Cir. 1999); *see San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."). It is not enough to allege, as Plaintiff does, that simply by virtue of their positions in the market Defendants must have known the risks XIV notes faced. And such allegations are certainly not enough to establish that Defendants had a plan to use their market knowledge to intentionally precipitate a liquidity crisis.

The portion of the complaint labeled "Scienter Allegations" provides more detailed allegations of the existence of a plan by Defendants to crash XIV notes, Compl. ¶¶ 105–123, but those allegations cannot be considered in support of Plaintiff's Section 11 claims.[6] The complaint expressly states that "Plaintiff does not allege that the Credit Suisse Defendants or the Janus Defendants had scienter or fraudulent intent, which are not elements of a § 11 claim, for the purposes of its 1933 Act claims," *Id.* ¶ 89. That disavowal alone could allow the Court to conclude that Plaintiff has not adequately alleged the existence of a scheme by Credit Suisse to crash XIV notes. Plaintiff cannot on the one hand assert that Credit Suisse omitted a material fact because "it did not disclose its *intention*" to use hedging to impact the value of XIV notes, Pl. Mem. at 18, and on the other hand disclaim any allegation of "scienter or fraudulent intent," Compl. ¶ 89. But at a minimum, Plaintiff should be taken at its word, and the facts alleged only in support of scienter should not be considered in support of the Section 11 claim. Plaintiff concedes that it structured the complaint to exclude from its Section 11 claims any assertion that Defendants acted with scienter, in an effort to avoid the effects of Rule 9(b) and the PSLRA. Pl.

---

[6] To be clear, the Court expresses no opinion on whether the facts in the "Scienter Allegations" would be sufficient to establish that Defendants had a scheme to cause XIV notes to crash.

Mem. at 12–13.  Plaintiff had the prerogative to characterize its claims and structure its complaint however it wished, but it must now live with the consequences of its pleading decisions.  *Cf. Jennison v. Dick's Sporting Goods, Inc.*, No. 11 Civ. 4906, 2011 WL 6293061, at *2 (S.D.N.Y. Dec. 15, 2011) ("Plaintiff is the master of his complaint; he is bound by the allegations in his pleading."); *Hochroth v. William Penn Life Ins. Co. of New York*, No. 03 Civ. 7286, 2003 WL 22990105, at *1 (S.D.N.Y. Dec. 19, 2003) ("It is well established that the plaintiff is the 'master of his complaint' and may characterize his causes of action as he pleases.").

Plaintiff has failed to allege with specificity that Defendants made any material misrepresentations for the purposes of the Section 11 claim.  Defendants' motions to dismiss the Section 11 claim are, therefore, GRANTED.

III.  <u>Section 10(b) Claim</u>

Plaintiff's claims that Defendants made false and misleading statements and manipulated the market in violation of Section 10(b) of the Exchange Act, and its implementing regulation Rule 10b-5, 17 C.F.R. § 240.10b-5, largely fail for the same reason.  "To state a claim under Rule 10b-5[(b)] for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105 (2d Cir. 2007) (citation omitted).  And a claim for market manipulation under Rule 10b-5(a) and (c) "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities

exchange." *Id.* at 101.  A prerequisite of both claims is showing that Defendants engaged in some material misrepresentation or nondisclosure.  *See Wilson*, 671 F.3d at 130 ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.").

Plaintiff argues that the omissions that support the Section 11 claim support the claims under Rule 10b-5.  But Defendants' disclosures of the objective risks XIV notes faced were adequate to avoid any material misrepresentations under Section 11, and, therefore, suffice under Rule 10b-5.  *See In re Morgan Stanley Info. Fund*, 592 F.3d at 360.

It is unclear whether Plaintiff's allegation that Defendants designed XIV notes to fail could establish a material misrepresentation for purposes of Section 10(b), unlike for Section 11. The complaint does not expressly disavow its allegations of scienter in pleading the Section 10(b) claim, and those allegations might help Plaintiff to plausibly allege the existence of a plan by Credit Suisse Defendants to destroy XIV notes' value.  On the other hand, the complaint asserts that the same facts support the existence of misrepresentations for both the Section 11 claims and the Section 10(b) claims.  Compl. ¶ 104.  And for its Section 11 claims, the complaint plainly relies only on allegations outside the "Scienter Allegations."  *Id.*  It is at least conceivable that the Court should again take Plaintiff at its word, and disregard the scienter allegations in considering whether the complaint plausibly alleges a material misrepresentation for purposes of Section 10(b).

The Court does not need to decide, however, whether the "Scienter Allegations" should be considered in determining whether the complaint establishes the existence of a material omission for purposes of Plaintiff's Section 10(b) claim, or whether their inclusion would tip the scales in Plaintiff's favor on that issue.  Even if the scienter allegations were sufficient to

"nudge" the material misrepresentation assertion "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (internal quotation marks and citation omitted), they would still fall short of the heightened scienter pleading requirements. Plaintiff can establish scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Under the PSLRA, Plaintiff is required to meet the heightened burden of pleading facts that give rise to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A), which means they "must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).

Plaintiff's allegations in support of scienter are substantially identical to those addressed by this Court in *Set Capital*, and they fail for substantially the same reasons. *See Set Capital*, 2019 WL 3940641, at *14–16; *Set Capital*, 2019 WL 4673433, at *5–6. In an effort to establish that all Defendants had motive and opportunity to manipulate the value of XIV notes, Plaintiff alleges that Defendants had an incentive to disregard any risks to XIV notes because they were selling at a high price in January 2018, making large profits for Defendants. Compl. ¶ 122. And Plaintiff alleges that Credit Suisse Defendants had an incentive to try to drive down the value of XIV notes once they were sold, to eliminate the bank's exposure. *Id.* ¶ 123. But it is well-established that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [the scienter] inquiry." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). And addressing nearly identical allegations of scienter in *Set Capital*, this

Court adopted the position that at most they supported "the inference of an ordinary profit motive[, which] is non-culpable." 2019 WL 4673433, at *5 (ellipses omitted). More to the point, the Court concluded that "there was a more plausible innocent explanation of Credit Suisse's motives: it had simply taken advantage of the high price of XIV notes in January 2018 by selling them in large quantities, and then taken advantage of the market crash in February 2018 by exercising its right to accelerate the notes and force redemption at a very low price, without intending the former action to cause the latter." *Id.* The same is true in this case.

Moreover, as in *Set Capital*, Plaintiff here alleges as circumstantial evidence that Defendants must have known, by virtue of their positions in the market, of the liquidity risks XIV notes faced. Compl. ¶¶ 106, 108; *see* 2019 WL 4673433, at *6. But as the Court explained in that case, "To raise an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of a defendant's public statements—or, for a market-manipulation claim like this one, the inaccuracy of the impression produced by a defendant's actions— plaintiffs must specifically identify the reports or statements containing this information." *Set Capital*, 2019 WL 4673433, at *6 (internal quotation marks and alterations omitted) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)). And Plaintiff here, just like the plaintiffs in *Set Capital*, has "not identified any specific documents that would have put Credit Suisse on notice of the statistical certainty of volatility spikes or the effect of Credit Suisse adjusting its hedge during such spikes." *Id.* Here, Plaintiff sets forth detailed allegations describing Credit Suisse's risk management procedures, and asserts that compliance with those procedures would have required senior officials at Credit Suisse to familiarize themselves with the risks XIV notes faced. Compl. ¶¶ 109–121. But as discussed above, *supra* at 14, by failing to "identify specific reports or meetings, name the actors

involved, or indicate the substance of the data or conversations" that led to the Credit Suisse's supposed awareness of those risks, these allegations do not even meet Rule 9(b)'s requirement to plead the circumstances of fraud with specificity, much less create a strong inference of scienter. *Ressler*, 75 F. Supp. 2d at 54.

Because Plaintiff has failed to adequately allege the existence of a material misrepresentation for most of the Section 10(b) claims, and has failed to establish a strong inference of scienter for all of them, Defendants' motions to dismiss the Section 10(b) claims are GRANTED.

IV.     <u>Regulatory Claims</u>

Plaintiff claims that Defendants further violated Section 11 and Section 10(b) because Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), and Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503") required Defendants to disclose the risks XIV notes faced and their purported plan to destroy the notes. Failure to make disclosures in accordance with those regulatory provisions can serve as the basis of a claim under Section 11 or Section 10(b). *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section 10(b). We have already held that failing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." (citation omitted)). But Plaintiff cannot establish a Section 11 violation on the basis of any omissions under the disclosures required by Item 303 or Item 503, because—once again—Plaintiff has not alleged with specificity any material omissions by Defendants. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (rejecting Section 11 claim premised on

Item 503 where "plaintiffs ha[d] not pleaded any misstatements in the Offering that give rise to a cause of action under the Securities Act").

As for the Section 10(b) claims, "failure to make a required Item 303 disclosure in a 10–Q filing . . . is actionable only . . . if all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure*, 776 F.3d at 100 (citation omitted). Scienter, of course, is one of those requirements. Establishing a Section 10(b) claim on the basis of failure to comply with Item 503 also logically requires a showing of scienter. *Cf. City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("Although there is scant caselaw on Item 503, courts have generally found Item 503 violations to track Rule 10b–5 violations."). For that reason, Plaintiff's failure to adequately allege scienter is fatal to these claims as well.

Defendants' motions to dismiss the claims based on Items 303 and 503 are GRANTED.

V.      Section 9 Claim

The remainder of Plaintiff's claims are parallel to or derivative of the Section 11 and Section 10(b) claims, and so they too must be dismissed. Plaintiff asserts a claim under Section 9(a)(4) and Section 9(f) of the Exchange Act, 15 U.S.C. §§ 78i(a)(4), (f).[7] Compl. ¶¶ 141–149. "A claim under Section 9(a)(4) requires a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015). These requirements closely parallel those of Section 10(b), and courts in this district have repeatedly held that failure to successfully plead a Section 10(b) claim is also fatal to a Section 9 claim. *See Set Capital*, 2019 WL 3940641, at *19; *Salvani*, 50 F.

---

[7] Section 9(f) creates liability for any person who willfully participates in a violation of Section 9(a).

Supp. 3d at 476; *Panfil v. ACC Corp.*, 768 F. Supp. 54, 59 (S.D.N.Y. 1991).  Because Plaintiff has failed to allege misrepresentations and scienter sufficient to sustain a Section 10(b) claim, the Section 9(a)(4) claim also fails.

Defendants' motions to dismiss the Section 9 claim are GRANTED.

VI.　　 Control Person Claims

Plaintiff also asserts "control person" liability against Credit Suisse Group and Janus Henderson Group as entities, and against the individual Defendants Thiam and Mathers, under Section 15 of the Securities Act, Compl. ¶¶ 98–103, and Section 20 of the Exchange Act, Compl. ¶¶ 150–155.  But "[e]ach of these claims is necessarily predicated on a primary violation of securities law." *Rombach*, 335 F.3d at 177.  Because Plaintiff has not adequately alleged any primary violation here, "these secondary claims must also be dismissed." *Id.* at 178. Defendants' motions to dismiss the control person claims are GRANTED.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 19 and 22, and close the case.

SO ORDERED.

Dated:  January 2, 2020
　　　 New York, New York

_____
ANALISA TORRES
United States District Judge